953 F.2d 1312
 UNITED STATES of America, Plaintiff-Appellee,
v.
Christopher Keith ANDREWS, a/k/a Chris Andrews, Albert Earl
Shearls, Ricardo Crimes, a/k/a Rico Crimes, a/k/a Teddy
Crimes, Wayne Sharp, a/k/a Mule, Louis Anderson, Chester
James Sharp, a/k/a Chester Sharp, Alvin Taylor, Jr., a/k/a
Junior Taylor, Michael Howard, a/k/a Mike Howard, Lula M.
Sharp Smith, a/k/a Lula Sharp, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Daryon SHARP, a/k/a Dewayne Smith, a/k/a Buck, a/k/a
Buckwheat, Defendant-Appellant.
 Nos. 89-7445, 89-7589.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 19, 1992.
 
 Glenn L. Davidson, Mobile, Ala. (Court-appointed), for Christopher Andrews.
 Matthew C. McDonald, Mobile, Ala. (Court-appointed), for Albert Earl Shearls, Jr.
 John Furman, Mobile, Ala. (Court-appointed), for Ricardo Crimes.
 W. Gregory Hughes, Mobile, Ala. (Court-appointed), for Melvin Wayne Sharp.
 Thomas M. Haas, N. Ruth Haas, Mobile, Ala., for Louis Anderson.
 Peter S. Mackey (Court-appointed), Burns & Mackey, Mobile, Ala., for Chester James Sharp.
 James M. Byrd, Mobile, Ala. (Court-appointed), for Alvin Taylor, Jr.
 W. Gary Hooks, Jr., Mobile, Ala. (Court-appointed), for Michael Howard.
 Rose A. McPhillips, Mobile, Ala. (Court-appointed), for Lula Sharp Smith.
 Thomas O. Bear, Foley, Ala., for Daryon Sharp.
 J.B. Sessions, III, U.S. Atty., Willie J. Huntley, Jr., Gina S. Washington, Asst. U.S. Attys., for the U.S.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before ANDERSON, Circuit Judge, GODBOLD and CLARK*, Senior Circuit Judges.
 CLARK, Senior Circuit Judge:
 
 BACKGROUND
 
 1
 In January, 1987, based on information given by Michael Funches, the Federal Bureau of Investigation opened an investigation into the crack cocaine commerce in Pritchard, Alabama. Funches became a paid confidential information source in March, 1987. Over the course of the next year and a half, he provided the FBI with information as to the extent of the drug trade in a seven block neighborhood in Pritchard.
 
 
 2
 This information showed that Daryon Sharp led the loose organization's crack cocaine trade in this seven block area. Funches sold drugs for Daryon Sharp from late 1985 to late 1986, but when he started using the crack himself, Daryon Sharp pulled away from him and started relying more on Bruce Montgomery. Bruce Montgomery and Jerome Watkins became "lieutenants," or second in command. The lieutenants delivered drugs from Daryon Sharp to Alvin Taylor, Jr., Ricardo Crimes, Melvin Wayne Sharp, Wayne Crenshaw, and Michael Howard, who in turn sold them on the streets daily. Chester Sharp, Daryon's cousin, allowed his home to be used to cook powder cocaine into its crack form and occasionally sold drugs. Herman Hill, who later became a government informant, tested the quality of the crack Daryon Sharp cooked. Chris Andrews and Albert Earl Shearls both sold drugs themselves, and acted as "runners", taking crack for others out to buyers who drove up in automobiles, and bringing back the money.
 
 
 3
 Daryon Sharp received his supply from his cousin Leon Sharp, and a person named "Fred." He in turn supplied the others who then sold it on the street. Profits were split between supplier and seller. There was also a loose specialization, different people selling in different quantities depending partly on their hierarchy in the organization. For example, Daryon Sharp and Bruce Montgomery largely sold "cookies" weighing an ounce. Michael Howard and Chris Andrews sold "sixteenths", consisting of approximately a gram of crack. Taylor sold street sized "halves" consisting of half a gram of crack. Shearls, Crimes, Melvin Wayne Sharp and Michael Howard sold "twenty-five cent pieces" consisting of a quarter of a gram of crack.
 
 
 4
 On December 20, 1988, a grand jury indicted nineteen people in an eighteen count indictment. Counts one to sixteen alleged different acts of possession and distribution against individual defendants. Count seventeen alleged that all the defendants conspired to possess with intent to distribute cocaine. Count eighteen sought forfeiture of various property owned by the defendants.
 
 
 5
 Herman Hill, Jerome Watkins, Michael Watkins, Bruce Montgomery and Wayne Crenshaw plead guilty to the conspiracy and to various, assorted counts of possession and distribution of cocaine. The trial against Andrews, Shearls, Crimes, Melvin Wayne Sharp, Anderson, Chester Sharp, Taylor, Michael Howard, and Lula Sharp Smith, Daryon's mother, proceeded on March 17, 1989.
 
 
 6
 Daryon Sharp was not tried with the others because he was a fugitive at the time of the first trial. He surrendered to law enforcement authorities on July 6, 1989, and went to trial with Mack McMillan on December 6, 1989. During the course of the trial, the government dismissed one possession charge against Sharp, and all charges against McMillan.
 
 
 7
 Appeals from both the trials have been consolidated.
 
 DISCUSSION
 A. Sufficiency of Evidence
 
 8
 All the defendants argue that the evidence was insufficient to convict them of the conspiracy as well as the substantive counts. In reviewing the sufficiency of the evidence supporting a jury verdict of guilty, "[w]e must view the evidence in the light most favorable to the government, accepting all reasonable inferences which support the verdict, and affirm the conviction if a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt."[1]
 
 
 9
 To support a conviction for conspiracy to possess cocaine with intent to distribute, the government must prove beyond a reasonable doubt that 1) a conspiracy to possess cocaine with intent to distribute existed between two or more persons, 2) the defendant knew of the conspiracy, and 3) the defendant knowingly and voluntarily became a part of this conspiracy.[2] The government need not prove that the defendant knew all the details of the conspiracy, but must prove at least that he or she knew the essential nature of the conspiracy.[3] Thus, a defendant may be guilty of conspiracy even if he or she joined it midway, or played only a minor role in the total scheme.[4]
 
 
 10
 A conspiracy may be proved both by direct and circumstantial evidence. Although "[c]lose association with a mere co-conspirator or mere presence at the scene of the crime is insufficient evidence of knowing participation in a conspiracy," this "knowing participation ... may be established through proof of surrounding circumstances such as acts committed by the defendant which further the purpose of the conspiracy."[5] We will thus uphold a conviction "when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him."[6]
 
 
 11
 The defendants' challenges to the sufficiency of evidence rely heavily on the argument that Michael Funches, the government's chief witness, is a paid informant and admitted drug user. Admittedly, some of Funches' testimony is contradictory. The credibility of a witness, however, is the sole province of the jury. An appellate court will not overturn a jury's decision to believe a witness.[7]
 
 
 12
 Although the indictment charged the defendants with conspiracy to possess with intent to distribute five to twenty kilograms of cocaine, the government did not have to prove this actual amount beyond a reasonable doubt to uphold the convictions. Quantity is not included as an element of the crime of conspiracy under 21 U.S.C. § 841(a)(1). Proof of quantity becomes relevant at the sentencing phase.[8]B. Sentencing
 
 
 13
 The base offence level for sentencing purposes under the U.S. Sentencing Guidelines for a conviction of conspiracy involving a controlled substance is the same as if the object of the conspiracy was completed.[9] In a jointly undertaken criminal activity or conspiracy, a defendant is sentenced pursuant to his relevant conduct. Under the sentencing guidelines, this relevant conduct includes, "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would otherwise be accountable."[10] Relevant acts in a conspiracy are those a defendant procured, counseled, or which were otherwise reasonably foreseeable by the defendant, but not acts in the conspiracy that were not within the scope of the defendant's agreement.[11]
 
 
 14
 This circuit has held that for conspiracy, the standards for sentencing under section 1B1.3 of the U.S. Sentencing Guidelines roughly approximate the substantive standards detailed by the Supreme Court in Pinkerton v. United States.[12] The Supreme Court's holding in Pinkerton that the "overt act of the partner in crime is attributable to all" is applicable as a guide to sentencing under the Guidelines. A sentencing court may thus hold a defendant responsible for all the reasonably foreseeable acts committed by the other participants in the conspiracy.[13]
 
 
 15
 Due process is satisfied when relevant factors in a sentencing hearing are established by a preponderance of the evidence,[14] but not by mere allegations in the indictment.[15] A court "may consider any information, including reliable hearsay, regardless of the information's admissibility at trial, provided that there are sufficient indicia of reliability to support its probable accuracy."[16]
 
 
 16
 Defendants Daryon Sharp, Chester Sharp, Melvin Wayne Sharp and Albert Earl Shearls challenge the sufficiency of evidence at the sentencing hearings proving their involvement with specific quantities of cocaine. We will discuss the individual challenges infra.
 
 
 17
 C. The Individual Defendants in United States v. Andrews
 
 1. Christopher Andrews
 
 18
 Christopher Andrews was indicted and found guilty on one count of conspiracy to distribute and possess with intent to distribute cocaine. He brings this appeal challenging only the sufficiency of the evidence against him at trial.
 
 
 19
 There is sufficient evidence to support Andrews' conviction. Our review of the trial record shows although he was mainly a large user of cocaine, he also conducted drug deals. He acted as a "runner" in the organization, or one who takes drugs for a seller to a buyer and brings back the sale money.
 
 
 20
 Funches' testimony is admittedly contradictory. He stated that he never saw Andrews make drug deals (R11-438), and also that he saw Andrews sell cocaine three to four times in the neighborhood on unspecified dates (R13-24). He testified both that he saw Jerome Watkins supply Andrews with crack two or three times in the summer of 1988 (R11-277), and also that he had never seen Watkins give crack to Andrews (R11-359, 437). He also stated that the last time he saw Andrews selling crack (supplied from Watkins) was "three years ago" in 1986 (R11-281-82), and also that he saw Andrews selling crack on the street "almost every day" in September, 1988 (R11-441).
 
 
 21
 There are other witnesses, however, establishing Andrews' involvement in the conspiracy. Herman Hill stated that Andrews obtained his crack from different people in the company of Jerome Watkins (R12-580), Daryon Sharp's "lieutenant" and a major conduit of cocaine from Sharp to the street sellers. Robert Howard also testified that he saw Andrews with Jerome Watkins on many occasions (R12-629).
 
 
 22
 Bruce Montgomery stated that Andrews sold crack for Daryon Sharp to keep up his own habit (R12-693-94). Herman Hill stated that he saw Andrews carry crack to various cars that came by (R12-582). Robert Howard saw Andrews conduct crack sales and also personally "scored," or bought crack from him many times between March, 1987 and December, 1988 (R12-629). Frank Martin stated that he saw Andrews sell cocaine three to four times between January and September of 1988 (R13-831). FBI agent Gary Clem testified that during his surveillance of the area, he saw Andrews standing around in the company of the others also charged in this conspiracy, go out to cars that drove up, lean in the car windows and have conversations of less than a minute with the occupants of the cars, and then return to his original location (R13-1121-22).
 
 2. Ricardo Crimes
 
 23
 The jury found Ricardo Crimes was guilty of one count of distribution and possession with intent to distribute cocaine on May 5, 1988, and one count of conspiracy. He brings this appeal challenging the sufficiency of evidence against him for both counts.
 
 
 24
 Evidence in the record supports the substantive count of possession with intent to distribute. On May 5, 1988, while the FBI were taping Mike Funches in a controlled buy from co-defendant Alvin Taylor, it also inadvertently taped Crimes selling a "quarter" of crack to an unknown buyer at the same time. Funches also testified to the event. The government introduced the tape into evidence. (R11-304, 335, R12-522; Government Exhibit 5). Crimes had also been willing to sell Funches six "quarters" of crack, but the FBI signalled Funches not to purchase from Crimes as Taylor was the object of the sting operation that day (R12-521-22).
 
 
 25
 There is also evidence supporting the charge of conspiracy. Funches testified that he bought cocaine on numerous occasions from Crimes for his personal use (R11-304, 466). He also testified that he saw Crimes sell crack daily in the neighborhood (R11-297-98). Frank Martin testified that he purchased cocaine approximately four times from Crimes while driving around the neighborhood in a car (R13-832-33), and two times when Crimes was riding a bicycle (R13-917-18). FBI agent Gary Clem testified that he saw Crimes sell cocaine on numerous occasions during the period of his surveillance (R13-1118-19).
 
 
 26
 There is a series of photographs in evidence showing a drug deal on July 8, 1988, linking Funches, Crimes, Chester Sharp and Taylor (Government Exhibits 19, 24, 29, 30, 31, 33, 34). Further, in the taped conversation of May 5, 1988, Crimes stated that he had only "quarters" but that co-defendant Taylor was the person from whom to obtain "sixteenths" of crack cocaine (Government Exhibit 5). This shows that Crimes was aware of the network and quantity specializations of the drug sellers.
 
 3. Michael Howard
 
 27
 The jury found Michael Howard guilty of one count of conspiracy. He brings this appeal challenging the sufficiency of the evidence against him.
 
 
 28
 Evidence at trial shows that Howard obtained his drugs from Daryon Sharp through both Jerome Watkins and Bruce Montgomery. Montgomery testified that he delivered packages of up to eight ounces of crack cocaine at a time from Daryon Sharp to Howard (R12-690-91). Between May and December of 1988, Montgomery delivered three such packages of cocaine from Daryon Sharp to Howard. Howard gave Montgomery the money made from selling the packages, which he would in turn give to Daryon Sharp (R12-714-15). Robert Howard testified that he had seen Michael Howard and Watkins together many times, and saw them exchange crack (R12-618). Funches also testified that he saw Watkins give Michael Howard one ounce packages of cocaine two or three times (R11-270-71).
 
 
 29
 Michael Howard sold drugs to Robert Howard, who also directed to him customers who bought crack for cash (R12-617-19). He also sold crack to Mike Funches three to four times during the period stated in the indictment (R11-284-85, 304, R12-530). Funches testified that Howard sold "quarters" and "sixteenths" both "seven days a week" (R11-285), and three or four times (R12-530) in Alabama Village, where he lived. Frank Martin stated that he bought "halves" of crack from Michael Howard approximately five times between January and September of 1988 (R13-836-37).
 
 4. Chester Sharp
 
 30
 The jury found Chester Sharp guilty of one count of conspiracy. He appeals the sufficiency of the evidence against him supporting his conviction and sentence.
 
 
 31
 Evidence introduced at trial supports Chester Sharp's conviction for conspiracy. He was aware of the essential purpose of the conspiracy agreement, and allowed his home to be used for "cooking" crack, or converting cocaine from powder into rock form. Bruce Montgomery testified that he and Daryon Sharp cooked crack at Chester Sharp's house with his knowledge. Daryon Sharp gave two ounces of the crack to Montgomery, and two ounces to Chester Sharp (R12-698-700). Herman Hill testified that he cooked crack with Daryon Sharp at Chester Sharp's house two or three times in Chester's absence (R12-554-55). Michael Funches heard from Daryon Sharp that Daryon cooked crack at Chester Sharp's house (R11-263).
 
 
 32
 Chester Sharp also sold crack occasionally during the evenings and at night. He had a day job. Michael Funches bought crack from Chester Sharp, and saw him selling the drug to others (R11-301, 305). There is a tape recording of negotiations between Funches and Chester Sharp concerning half an ounce of cocaine. Funches had $750 to spend on half an ounce, and Chester Sharp told him that he could get the cocaine from Daryon Sharp for less (Government Exhibit 8). Frank Martin testified that he bought "halves" from Chester Sharp three or four times between January and September of 1988. He also saw Chester Sharp sell cocaine a few times (R13-825-26).
 
 
 33
 Chester Sharp also challenges the sufficiency of the evidence supporting his sentence pursuant to a base offence level of involvement with at least 500 grams of cocaine. To support this sentence, the government needed to prove by a preponderance of the evidence that he reasonably could have foreseen that the conspiracy involved at least this amount of cocaine base.
 
 
 34
 Based on information from Michael Funches, Herman Hill, Montgomery and police officer Barry Denkins (R15-1683), Agent Clem estimated that Chester Sharp's position in the conspiracy would have involved him with six to eight ounces of cocaine a week (R15-1674, 1681). Funches testified that Chester Sharp sold crack in "sixteenths" (one gram) and "halves" (half a gram) four to five times a day, four to five times a week, for four to five months (R15-1743). From this essentially unrefuted testimony at the sentencing hearing and from the evidence at trial, we can infer that Chester Sharp was aware of, and could reasonably foresee, involvement by him and his co-conspirators with 500 grams of cocaine over the entire period of the conspiracy.
 
 5. Lula Sharp Smith
 
 35
 The jury found Lula Sharp Smith, also known as Lula Sharp, guilty of one count of possession with intent to distribute cocaine, and of conspiracy to distribute and possess with intent to distribute. She brings this appeal challenging the sufficiency of the evidence against her on both counts.
 
 
 36
 We find that the evidence was sufficient for a reasonable jury to infer that Lula Sharp had knowledge of the purpose of the conspiracy, and voluntarily joined it. Funches testified that he and his wife had exchanged a diamond ring for a sixteenth of crack from Lula Sharp (R11-305). He stated that she also gave him $150 to buy drugs with, and he split the profit from the resale of those drugs with her (R11-487). Montgomery testified that on three occasions, Daryon Sharp left packages containing crack for him in the care of Lula Sharp (R12-710).
 
 
 37
 There was also sufficient evidence for a reasonable jury to infer that she knowingly possessed cocaine with intent to distribute on December 16, 1988. On that day, FBI Agent Gary Clem went to her house with a warrant to seize her car, believed to have been used by Daryon Sharp to transport cocaine on his supply trips. While removing her Avon supplies from the trunk of the car, Lula Sharp reached past Agent Clem to get an unmarked brown paper bag. Clem testified that he saw a yellow box with a hole cut in its center through the opening of the paper bag, and asked to look at it. Lula refused, stating that she thought it was a Christmas present from her son. A tug-of-war ensued over the paper bag, which Agent Clem eventually won (R13-1134-36). An analysis of the compressed white powder in the yellow box revealed it to be 768.6 grams of cocaine (R13-1023).
 
 6. Melvin Wayne Sharp
 
 38
 The jury found Melvin Wayne Sharp guilty on one count of conspiring to distribute and possess cocaine with intent to distribute. He challenges the sufficiency of the evidence convicting him and his sentence under the U.S. Sentencing Guidelines.
 
 
 39
 We find that the evidence adduced at trial was sufficient to support a reasonable jury's verdict against him on the charge of conspiracy. Robert J. Howard testified that he directed customers to Melvin Wayne Sharp (R12-623). Montgomery made a trip with Melvin Wayne to Florida to get Leon Sharp, Daryon Sharp's supplier, out of jail. They paid between $20,000 and $40,000 in cash for Leon's bond. Montgomery testified that the money belonged to Daryon and Leon Sharp, and had been made by selling drugs. His and Melvin Wayne Sharp's role was to protect the cash (R12-704-05, 766).
 
 
 40
 Funches testified that he bought "quarters" and "ten-cent pieces" of crack from Melvin Wayne several times for his personal use (R11-298, 12-526). He saw him sell "quarters" of crack several times on the corner of Joseph and Lucky Street (R12-527). Both Robert Howard and Frank Martin testified that they bought crack from Melvin Wayne (R12-623-24; R13-833), and that they had seen him sell crack many times (R12-624, R13-834). FBI Agent Clem testified that when he was on surveillance, he observed many instances when Melvin Wayne went to cars that drove up in front of his house, and have brief conversations with their occupants (R13-1119-20).
 
 
 41
 The trial court sentenced Melvin Wayne Sharp pursuant to a base offence level of involvement with at least 500 grams of cocaine. Agent Clem estimated that Sharp, a "runner," sold "quarters" and "halves" on the street every day, but admitted that he did not know how much he sold a day (R15-1684). Funches stated that Melvin Wayne Sharp sold four to five times a day for a year (R15-1744). There is also evidence that the conspiracy Melvin Wayne Sharp aided and abetted distributed eight to fourteen ounces a week (R15-1668). This evidence is essentially unrefuted by the defense. We affirm the sentence, as Melvin Wayne Sharp could have reasonably foreseen involvement by himself and others in the conspiracy with 500 grams of cocaine over the entire period of the conspiracy.
 
 7. Albert Earl Shearls
 
 42
 The jury also found Albert Earl Shearls guilty of conspiracy. Shearls challenges the sufficiency of the evidence supporting his verdict and his sentence under the U.S. Sentencing Guidelines. He also asserts that when the district court did not sever his case from the others, it violated his due process rights.
 
 
 43
 The direct and circumstantial evidence at trial was sufficient to support a jury verdict against Shearls. Michael Funches (R11-267-68), Herman Hill (R12-593, 596-97), Robert Howard (R12-631-32), Bruce Montgomery (R12-702) and Frank Martin (R13-828) all stated that they saw Shearls with Jerome Watkins very often, sometimes while the latter was dealing drugs. Agent Clem also testified that Shearls was with Chris Andrews and Michael Watkins when they dealt drugs on the street (R13-1122).
 
 
 44
 Michael Funches testified that he bought crack several times a week from Shearls (R11-282, R12-526), and had given "sixteenths" of crack to him occasionally (R11-277). He had seen Shearls sell "twenty-five cent pieces" on numerous occasions, and pay Jerome Watkins, Daryon Sharp's "lieutenant", with the proceeds from the sales (R11-279). Later, when Shearls stopped using the drug personally, he rose up the ranks of the conspiracy to become another of Daryon Sharp's lieutenants (R11-283).
 
 
 45
 The trial court sentenced Shearls pursuant to a base offence level of involvement with at least 500 grams of cocaine. Agent Clem testified that although he could not be specific as to how much Shearls personally sold a day, he was in the constant company of the other members of the conspiracy who distributed a total of six to eight ounces of cocaine a week (R15-1666-68). At the sentencing hearing, Funches testified that he saw Shearls sell crack in half gram and one gram sizes three to four times a week over a six month period (R15-1741). This evidence is essentially unrefuted by the defendant. We thus uphold the sentence, as defendant Shearls could have reasonably foreseen involvement by him and others in the conspiracy with at least 500 grams of cocaine.
 
 
 46
 We also hold that the trial court did not err in denying Shearl's motion to sever his trial from the others. In the interests of judicial economy, co-conspirators should generally be tried together.[17] The fact that a defendant only participated in one aspect of the conspiracy does not by itself warrant severance.[18] F.R.Crim.P. 14 allows a court to grant severance if the defendant "is prejudiced by a joinder of offenses or of defendants." Prejudice results when a jury is unable to separate the evidence adduced against a defendant from all the other evidence against his co-defendants.[19] Cautionary instructions to the jury, however, are presumed to adequately safeguard against prejudice.[20]
 
 
 47
 A motion for severance is entrusted to the sound discretion of the trial judge and will only be reversed on a showing of an abuse of discretion. To obtain a reversal, an appellant must demonstrate that he was unable to receive a fair trial and suffered compelling prejudice.[21] In this case, the trial court gave cautionary instructions periodically to the jury. Apart from rearticulating his general insufficiency of evidence argument, Shearls has not shown specific instances where the jury could not separate the evidence against him at the trial. Thus, he has not overcome the presumption that the trial judge's cautionary instructions safeguarded him against prejudice.
 
 8. Alvin Taylor
 
 48
 The jury found Alvin Taylor guilty on one count of conspiracy and three separate substantive counts of distribution and possession with intent to distribute cocaine on May 5, 1988, July 7, 1988 and July 27, 1988. He contends that the evidence was insufficient to support his convictions on all four of the counts. We hold that it was.
 
 
 49
 On May 5, 1988, Michael Funches made a controlled purchase of crack from Taylor (R11-301-02). The FBI recorded the transaction with a body recorder Funches was wearing. It introduced the tape at trial as Government's Exhibit 5 (R11-336).
 
 
 50
 Agent Clem testified that he set up another transaction, in which he directed Herman Hill to make a purchase from Taylor at Taylor's apartment on June 27, 1988 (R13-1110-15). Herman Hill testified that although he actually made the purchase from Marcus Hale, a co-conspirator who pled guilty, the purchase was in Taylor's presence (R12-569). There were apparently many people coming and going from Taylor's apartment at that time, purchasing drugs lying on Taylor's kitchen table (R12-567-72). A tape of the transaction was introduced at trial as Government's Exhibit 7.
 
 
 51
 On July 8, 1988, the FBI directed Funches to make another controlled purchase from Taylor. Funches bought two "sixteenths" of crack from Taylor. The body transmitter Funches wore did not work and no tape was made of the transaction (R11-350-51). The FBI took numerous photographs of the transaction from their surveillance van, however, which the government introduced at trial as Exhibits 19, 24, 29, 30, 31, 33, 34 and 36. Also present at the transaction were Crimes and Chester Sharp.
 
 
 52
 Other evidence also shows that Taylor was a knowing participant in the conspiracy. Robert Howard testified that he had seen hundreds of customers buy crack from Taylor, and personally bought crack many times (R12-626-27). Frank Martin testified that he bought crack several times from Taylor, and also saw him sell crack to other people (R13-835).
 
 9. Louis Anderson
 
 53
 Anderson was convicted by the jury on count seventeen, which charged him and the other defendants with conspiring and agreeing with each other and others unnamed to knowingly and intentionally distribute and possess with intent to distribute more than five kilograms of crack cocaine. This was the only count in the eighteen count indictment in which Anderson was charged.
 
 
 54
 Unlike in the case of the other defendants, we do not find one iota of evidence to support Anderson's connection with the conspiracy led by Daryon Sharp. Although we do find evidence that Louis Anderson bought and sold cocaine during the relevant period, that evidence relates to an entirely different conspiracy. Anderson, Allen Love and another individual were indicted in a different case from the one we are reviewing, and Love had entered a plea agreement with the government. Pursuant to Fed.R.Evid. 404(b), the government offered evidence that Love had purchased cocaine for Anderson to prove Anderson's intent in this case. In offering Love's testimony, however, the prosecution stated: "That is what we would be showing as far as Mr. Love's testimony, his involvement with Louis Anderson. His involvement with Louis Anderson as far as this testimony in this case is totally separate and unrelated to that" (R12-780). The government attorney also made this admission: "Well, it would be my position--I don't know that I can prove it, that the kilogram he [Anderson] was getting he was going to come back and distribute it as part of this conspiracy. That is speculation. As I say, I can't prove that" (R13-782).[22]
 
 
 55
 Other evidence offered against Anderson also failed to link him to the conspiracy which was the subject of this trial. Funches testified that he heard Crenshaw say that he obtained drugs from Anderson (R11-295). However, he personally had not seen Anderson sell drugs, nor had he bought any from him (R12-524). Frank Martin testified that he had bought five "halves" of crack from Anderson between January and September, 1988 (R13-838). There is no evidence, however, to show that any of this crack was originally obtained by Anderson from anyone in the Daryon Sharp group. In November, 1988, FBI Agent Clem used Martin to attempt a controlled purchase of two "sixteenths" of crack. This attempt failed because Anderson saw a truck which he correctly suspected as an undercover police vehicle (R13-838-49).
 
 
 56
 In summary, while the government established that Anderson purchased from Love three one-half kilograms of cocaine, at prices of $8000, $9000, and $8500 between June and December of 1988, this testimony only goes to show that Anderson was a competitor of Daryon Sharp in the same market, not a co-conspirator. There is, no evidence linking Anderson to Daryon Sharp, the main supplier in the conspiracy which is the subject of the indictment and trial.
 
 D. United States v. Sharp
 
 57
 The jury at the second trial convicted Daryon Sharp of one count of conspiracy to possess with intent to distribute cocaine, and two counts of distributing and possession of cocaine with intent to distribute on June 23, 1988 and December 16, 1988. Daryon Sharp challenges his convictions and sentence as insufficiently supported by the evidence. He also alleges that his trial counsel was ineffective to the extent that his constitutional rights were violated.
 
 1. Sufficiency of the evidence
 
 58
 On June 23, 1988, Agent Clem supplied Funches with $750 to make a controlled buy of half an ounce of cocaine from Daryon Sharp. Since Funches knew that Daryon Sharp suspected that he was an informer and would not deal directly with him, Funches contacted Herman Hill, who went with him to Daryon Sharp. Funches gave Hill the money, who in turn handed it to Sharp. Sharp told Funches and Hill to meet him later when he handed Hill a package of a half ounce of powder cocaine. Hill in turn handed the cocaine to Funches. FBI agents arrested Hill and Funches later (R2-87-90, 176-78). The cocaine weighed in at 14.84 grams, and was introduced into evidence as Government Exhibit 9 (R3-476). Since the jury was entitled to believe both Funches' and Hill's testimony regarding the transaction, we find sufficient evidence upholding Sharp's conviction on this count.
 
 
 59
 On December 16, 1988, pursuant to a warrant, Agent Clem seized a car believed to be driven by Daryon Sharp on his trips to Atlanta to obtain cocaine. He found 768.6 grams (R3-349) of cocaine in a box in the trunk of the car (R3-364-67).[23] Later, after being taken into custody and signing a waiver of his rights (R3-428), Sharp verbally confessed that the cocaine was his (R3-430). In a hearing outside the presence of the jury, Sharp denied knowingly waiving his rights and also making the confession (R3-412-14). The district court, however, held that this confession was voluntary (R3-421-22) and allowed Clem's testimony regarding it. The jury was entitled to believe Agent Clem's testimony as well as the circumstantial evidence supporting Sharp's possession of the cocaine, and thus there is sufficient evidence supporting his conviction on this count.
 
 
 60
 There was also sufficient evidence to support Daryon Sharp's conviction for conspiring to possess with intent to distribute cocaine. Funches testified that Jerome Watkins sold him cocaine he had obtained from Daryon Sharp (R2-80). Watkins also supplied cocaine from Sharp to Michael Howard (R2-81), Shearls (R2-82), Michael Watkins (R2-82), Andrews (R2-83), and Marcus Hale (R2-107). Hill and Montgomery saw Daryon Sharp cook powder cocaine into crack at Chester Sharp's house (R2-173, R2-273-75), and Hill tested the quality of the crack for him several times (R2-174-75).
 
 
 61
 Rico Crimes, a defendant in the first trial, testified against Daryon Sharp in the second trial. He stated that Daryon Sharp supplied him with $1000 worth of cocaine six or seven times (R2-240). He saw Daryon cooking crack four to five times (R2-241), and confirmed Hill's testimony that Hill tested crack for Sharp (R2-242).
 
 
 62
 Bruce Montgomery, Sharp's lieutenant, testified that he sold crack for Sharp both before and during the period charged in the indictment (R2-269-72, 280). After May 1988, when he was released from prison (R2-291), Montgomery sold smaller street sized pieces he cut up from ounce pieces Sharp supplied him (R2-272). Sharp gave him one kilogram of cocaine and nine ounces at another time for resale (R2-279-80). He also delivered two-ounce quantities of crack several times to Jerome Watkins and Michael Howard (R2-281), and packages of unknown quantity to Andrews and Taylor (R2-287).
 
 
 63
 The government also put on an array of witnesses and evidence of numerous cars and trucks that Daryon Sharp and his friends and relatives had bought with cash (e.g. R2-337, R3-469), presumably inferring that the large quantities of cash used to purchase the vehicles were illegitimately obtained.
 
 2. Sentencing
 
 64
 Daryon Sharp was sentenced pursuant to an involvement with ten kilograms of cocaine. He challenges the sufficiency of the evidence at the sentencing hearing proving his involvement with this amount.
 
 
 65
 At the sentencing hearing the defense put on Hill, who testified that Sharp was only involved with one kilogram of cocaine (R3-652), and Wayne Crenshaw, who denied Sharp's guilt completely (R3-666). The government sought to introduce portions of the transcript from the first trial to establish that Sharp was involved with over fifteen kilograms of cocaine. The district court found, however, that just the evidence at the second trial was sufficient to show by a preponderance of evidence that Sharp was involved with ten kilograms of cocaine (R3-671-72, 677).
 
 
 66
 The defense challenges the reliability of the evidence placing Sharp at the head of the distribution scheme, and thus involved in all the cocaine distributed by the scheme. It asserts that the district court arbitrarily relied on "contradictory and inconsistent" witnesses to establish Sharp's leadership of the distribution scheme. We must reject this argument as we hold that the government had already proven Daryon Sharp's involvement in the conspiracy beyond a reasonable doubt. The same testimony that established Sharp's involvement in the conspiracy, which the jury believed, put him at its head.
 
 
 67
 The sentencing court was thus entitled to sentence Sharp for all the trade in cocaine described at his trial. The evidence at trial fairly inferred that Daryon Sharp was involved with at least ten kilograms of cocaine. This would include Montgomery's extensive testimony that he both sold and delivered to others large quantities of cocaine Daryon Sharp supplied (R2-272, 279-80, 281, 287),[24] Funches testimony regarding the multilevel scheme involving many sellers and daily distribution over one and a half years (R2-80-83),[25] the 768.6 grams found in the car Sharp drove, and Crimes testimony that he obtained six to seven ounces of cocaine from Sharp directly (R2-240).
 
 3. Ineffective assistance of counsel
 
 68
 Generally, we do not consider claims of ineffective assistance of counsel on direct appeal, as there usually has been insufficient opportunity to develop the record pertaining to the merits of these claims.[26] Such cases are usually resolved post-appeal in a habeas corpus proceeding, where an evidentiary hearing may be held. We will, however, consider a claim on direct appeal where there is sufficient evidence on the record for us to do so.[27] We find that there is sufficient evidence in the trial record for us to consider Sharp's claim.
 
 
 69
 We find Sharp's allegations that his trial counsel was constitutionally ineffective, and he suffered prejudice as a result, without merit. To obtain a reversal of a conviction because of constitutionally ineffective assistance of counsel, a defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced the defense.[28] Counsel is held to a standard of "reasonably effective assistance," which a court must generally presume and not determine from hindsight.[29] Even if an error is made, however, it does not warrant a reversal of a conviction if the error had no effect on the judgment, as the Sixth Amendment guarantee of counsel is to ensure the reliability of the judgment.[30]
 
 
 70
 Two witnesses who allegedly would have testified that Sharp was working in their garage daily in 1988 did not show up at the courthouse. The defense had relied on a government subpoena, and Daryon Sharp and his sister had contacted them the day before their testimony was scheduled. The individuals had assured the defense that they would be at the courthouse to testify (R3-559-60). Trial counsel made a decision not to pursue the matter when the witnesses did not appear, expressing his doubts to the court as to the benefit the testimony might be to the defense (R3-535). Sharp now argues that because his attorney did not issue a defense subpoena to the witnesses, he could not prove his defense of non-involvement or withdrawal from the conspiracy.
 
 
 71
 The evidence of Sharp's guilt at trial was overwhelming. The "alibi" that these witnesses may have produced would have only covered part of the period charged in the indictment, and would not have directly refuted testimony of Sharp's involvement. We thus conclude that even had the witnesses' testimony been presented to the jury, the verdict would have remained the same. Because we find that the actions of counsel did not prejudice the defense, we need not decide if such actions were ineffective.[31]
 
 
 72
 Sharp also alleges that he was prejudiced because his counsel did not move for a mistrial when the government allegedly coached and subsequently impeached Herman Hill in his testimony regarding a purchase of cocaine from co-defendant Mack McMillan. This allegation is patently meritless. As a result of Hill's change in testimony, Sharp's counsel moved for dismissal of the relevant count of possession with intent to distribute against Sharp. The district court granted the motion. The government also dismissed all its charges against McMillan.
 
 CONCLUSION
 
 73
 For the forgoing reasons, the convictions and sentences of defendants Andrews, Shearls, Crimes, Melvin Wayne Sharp, Chester Sharp, Taylor, Howard and Lula Smith are AFFIRMED, and the conviction of defendant Anderson is REVERSED. This case is REMANDED to the district court for proceedings consistent with this opinion.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 [1]
 United States v. Meester, 762 F.2d 867, 881 (11th Cir.) (citations omitted), cert. denied, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985)
 
 
 [2]
 United States v. Weaver, 905 F.2d 1466, 1479 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 972, 112 L.Ed.2d 1058 (1991)
 
 
 [3]
 Meester, 762 F.2d at 881
 
 
 [4]
 United States v. Howard, 895 F.2d 722, 724 (11th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 3286, 111 L.Ed.2d 794 (1990); United States v. Roper, 874 F.2d 782, 787 (11th Cir.), cert. denied, 493 U.S. 955, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989); United States v. Alvarez, 625 F.2d 1196, 1198 (5th Cir.1980), cert. denied, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981)
 
 
 [5]
 United States v. Vera, 701 F.2d 1349, 1357 (11th Cir.1983)
 
 
 [6]
 United States v. Figueroa, 720 F.2d 1239, 1246 (11th Cir.1983)
 
 
 [7]
 United States v. Hewitt, 663 F.2d 1381, 1385 (11th Cir.1981) (jury entitled to believe government's witnesses even if they consist of "an array of scoundrels, liars and brigands")
 
 
 [8]
 United States v. Van Hemelryck, 945 F.2d 1493, 1501 (11th Cir.1991); United States v. Cross, 916 F.2d 622, 623 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1331, 113 L.Ed.2d 263 (1991); United States v. Simmons, 725 F.2d 641, 643-44 (11th Cir.), cert. denied, 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984). See United States v. Ervin, 931 F.2d 1440, 1442 (11th Cir.1991) (defendant who pled guilty to conspiracy involving six and one half kilograms of cocaine sentenced for full amount even though he alleged actual knowledge of only four kilograms)
 9 U.S.S.G. § 2D1.4.
 10 U.S.S.G. § 1B1.3(a)(1).
 11 U.S.S.G. § 1B1.3, Application Note 1.
 
 
 [12]
 328 U.S. 640, 646-47, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946)
 
 
 [13]
 United States v. Lafraugh, 893 F.2d 314, 317 (11th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 2601, 110 L.Ed.2d 281 (1990) (defendant was responsible for entire losses caused by the conspiracy, including those he did not cause)
 
 
 [14]
 United States v. Alston, 895 F.2d 1362, 1373 (11th Cir.1990). In a pre-Sentencing Guidelines case, the Supreme Court stated that due process was not violated by an application of the preponderance of the evidence standard to factual findings in sentencing hearings. McMillan v. Pennsylvania, 477 U.S. 79, 91-93, 106 S.Ct. 2411, 2419-20, 91 L.Ed.2d 67 (1986)
 
 
 [15]
 United States v. Castellanos, 904 F.2d 1490, 1495 (11th Cir.1990)
 
 
 [16]
 Id.; see also U.S.S.G. § 6A1.3(a)
 
 
 [17]
 United States v. Leavitt, 878 F.2d 1329, 1340 (11th Cir.), cert. denied, 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989)
 
 
 [18]
 United States v. Pepe, 747 F.2d 632, 650-51 (11th Cir.1984)
 
 
 [19]
 United States v. Dorsey, 819 F.2d 1055, 1058 (11th Cir.1987), cert. denied, 486 U.S. 1025, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988)
 
 
 [20]
 United States v. Kopituk, 690 F.2d 1289, 1320 (11th Cir.1982), cert. denied, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983)
 
 
 [21]
 Leavitt, 878 F.2d at 1340; United States v. Van Horn, 789 F.2d 1492, 1505 (11th Cir.), cert. denied, 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986)
 
 
 [22]
 Even in its closing argument, the prosecution merely summarized the F.R.Evid. 404(b) testimony against Anderson, making no attempt to link Anderson, either as a supplier or distributor, to the conspiracy led by Daryon Sharp (see R14-1404-07)
 
 
 [23]
 This is the same incident of possession for which Lula Sharp Smith was also convicted
 
 
 [24]
 Montgomery also testified that he personally sold about $500,000 worth of cocaine supplied from Sharp (R2-282) over a period of time, some of which overlapped the period charged in the conspiracy. This would involve at least 500 ounces at the going "wholesale rate" of $1000 an ounce (R2-272), totalling well over ten kilograms
 
 
 [25]
 Evidence at the sentencing hearing in the first trial showed that the multi-level scheme distributed eight to fourteen ounces weekly (R15-1668). Although the district court did not specifically consider evidence from the first trial for purposes of sentencing, it was entitled to do so. See Castellanos, 904 F.2d at 1495 ("a court may consider any information, including reliable hearsay, regardless of the information's admissibility at trial" for purposes of sentencing); U.S.S.G. § 6A1.3(a)
 
 
 [26]
 United States v. Gholston, 932 F.2d 904, 905 (11th Cir.1991); see United States v. Carter, 721 F.2d 1514, 1537 n. 32 (11th Cir.), cert. denied, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984)
 
 
 [27]
 See e.g., United States v. Brown, 591 F.2d 307, 310 (5th Cir.), cert. denied, 442 U.S. 913, 99 S.Ct. 2831, 61 L.Ed.2d 280 (1979)
 
 
 [28]
 Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)
 
 
 [29]
 Strickland, 466 U.S. at 689, 104 S.Ct. at 2065
 
 
 [30]
 Strickland, 466 U.S. at 691-92, 104 S.Ct. at 2066-67
 
 
 [31]
 See Blanco v. Singletary, 943 F.2d 1477, 1495 (11th Cir.1991)