**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James A. ADAMS, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Otto J. RUNKEL, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Buddy DAVIS a/k/a Indian; Philip Cohron; Joe Wayne Jones; and James A. Adams, Defendants–Appellants.**

Nos. 91–3356, 91–3680 and 91–3691.

United States Court of Appeals,
Eleventh Circuit.

Sept. 22, 1993.

the district court committed no error, and we affirm the convictions and sentences.

## I. INTRODUCTION

This case involves the importation of marijuana in small aircraft. There are numerous characters in the plot and a large number of transactions. The defendants were in the practice of using their own airplanes, or leasing, stealing or borrowing other planes to fly to Belize, pick up loads of marijuana and fly them back to the United States. The marijuana would be dropped to waiting accomplices while the plane was airborne, a practice referred to by the parties as "kicking," or it would be unloaded after landing at remote, sometimes homemade, airstrips in Florida and Alabama.

The smuggling ring was organized and managed by Glen Munro, a conspirator who was convicted for his drug smuggling activities in a separate proceeding and is serving a sentence. By his own estimates he had personally made about seven million dollars from his smuggling operations. Munro established a relationship with Johnny Crawford as a source for marijuana. Crawford was living in Belize and, in addition to securing marijuana, he operated a runway and marijuana loading operation there. Munro and his partners recruited pilots and organized their flights, arranged landing sites and recruited individuals to retrieve kicked bundles of marijuana or to unload airplanes that had landed at remote airstrips. The marijuana was sold for further distribution. From the revenue generated by these sales the conspiracy's ringleaders would pay their expenses and their helpers and keep the resulting profit.

The appellants in this case are each participants in this highly organized drug smuggling operation. Appellant Joe Jones owned farm land on which a homemade airstrip was constructed for the planes to land and unload their illegal cargo. Jones and appellant Philip Cohron were implicated in securing airstrips. Cohron and appellant Buddy Davis

Stephen E. Sutherland, Pensacola, FL, for Otto J. Runkel.

Lyndia F. Padgett, U.S. Atty., Randall J. Hensel, Asst. U.S. Atty., Pensacola, FL, for U.S.

Ronald W. Johnson, Pensacola, FL, for Buddy Davis.

Joseph L. Hammons, Pensacola, FL, for Philip Cohron.

Robert A. Harper, Tallahassee, FL, for Joe Wayne Jones.

Morris D. Berman, Charles Giesen, Giesen & Berman, S.C., Madison, WI, for James A. Adams.

Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and BRIGHT *, Senior Circuit Judge.

CARNES, Circuit Judge:

This is an appeal by five defendants who were convicted and sentenced on four counts of importing and distributing large quantities of marijuana. The defendants appeal various aspects of their trial and sentences. We conclude that the district court erred in sentencing one of the defendants, James Adams, and we vacate and remand the relevant portion of that sentence. In all other respects,

---

* Honorable Myron H. Bright, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

were implicated as members of the operation's ground crew who retrieved kicks and unloaded planes. Appellant Otto Runkel was involved as a pilot for one aborted smuggling trip to Belize, and appellant James Adams was his co-pilot and helper for this trip.

Fourteen defendants, including the five defendants who bring this appeal, were indicted in a four-count sealed indictment. Count 1 of the indictment charged a conspiracy to knowingly and intentionally import 1000 or more kilograms of marijuana into the United States. Count 2 charged a conspiracy to possess with intent to distribute 1000 or more kilograms of marijuana. Counts 3 and 4 respectively charged each defendant with the substantive crimes of importing and possessing with intent to distribute 1000 or more kilograms of marijuana. In addition to the fourteen defendants, the indictment listed nine other co-conspirators who were not charged therein, as well as "others known and unknown." All the defendants initially pleaded not guilty.

James Adams filed a motion to dismiss the indictment on double jeopardy grounds arguing that he and co-defendant Otto Runkel had been prosecuted for crimes arising from the same facts at issue here in a prior proceeding in the Southern District of Florida. Runkel joined in Adams' motion, which was denied. Adams filed an interlocutory appeal of the trial court's denial of his double jeopardy motion, No. 91–3356, and that appeal has been consolidated with the present one. Subsequently, Runkel withdrew his plea of not guilty and entered one of guilty to all four counts, but he reserved his right to appeal the court's ruling on his double jeopardy motion. Runkel's appeal of the denial of the double jeopardy motion, No. 91–3680, is also consolidated with the main appeal by the other defendants, No. 91–3691. All of the defendants, other than Runkel, maintained their pleas of not guilty. After a lengthy trial where many co-conspirators tes-

tified against the defendants, each remaining defendant was convicted on all four counts. The defendants were sentenced and they are all presently incarcerated, with the exception of James Adams. Adams, Cohron, Davis, Jones, and Runkel appeal various aspects of their convictions and sentences.

## II. ISSUES PRESENTED

A. Whether the prosecutions of Adams and Runkel were violations of double jeopardy.

B. Whether the district court erred by refusing to suppress statements made by Adams upon confrontation with Customs agents.

C. Whether the district court erred by refusing to suppress evidence seized from the aircraft in which Adams and Runkel were riding.

D. Whether the district court erred by refusing to sever Adams and Cohron from the main trial.

E. Whether the district court correctly determined the quantity of contraband for the sentences of Adams and Davis.

F. Whether the evidence was sufficient to convict Cohron.

G. Whether the district court erred by applying the mandatory minimum sentence to Cohron.

H. Whether Davis and Jones were denied a fair trial by the district court's allowing witnesses to testify in prison garb.

I. Whether the evidence established multiple conspiracies instead of only one.[1]

## III. DISCUSSION

### A. DOUBLE JEOPARDY

■ James Adams and Otto Runkel argue that earlier proceedings against them consti-

---

1. Some other issues are raised but warrant no extended discussion. Defendants Jones and Davis did not raise at trial their argument that the district court should not have allowed testimony concerning the convictions of their co-conspirators. We find no plain error in the district court's admission of that testimony. The district court's refusal to allow Cohron to intro-

duce convictions more than ten years old for impeachment purposes was not an abuse of discretion. The district court did not abuse its discretion by admitting into evidence firearms seized from one of the conspirators. Finally, the objection by Jones and Davis to the district court's supplemental *Pinkerton* instruction is without merit.

tute a double jeopardy bar to the present prosecution. In February of 1987, Runkel and Adams, acting as pilot and co-pilot, took off from an uncontrolled airstrip in Avon Park Florida in a twin-engined Piper airplane. Information from an informant had led agents to obtain a court order to secretly equip the aircraft with a transponder so that it could be tracked. The aircraft was tracked flying south and west for approximately 100 miles until the signal faded. At this point the aircraft had left United States airspace. Agents picked up the same aircraft returning in an easterly direction nine or ten hours after it had taken off. Realizing that the aircraft was headed for the same strip from which it left, agents intercepted the plane as soon as it landed. Testimony from co-conspirators later revealed that the plane had been flown to Belize, but it did not stop because Runkel did not see his connections waiting on the ground. The plane returned without the intended load of marijuana.

As a result of their flight to Belize, Runkel and Adams were prosecuted in the Southern District of Florida for knowingly and willfully displaying and causing to have displayed false and misleading registration marks on

the Piper aircraft with the intent to commit crimes relating to a controlled substance. 49 U.S.C.App. § 1472(b).[2] Although an intent to commit a controlled substance crime affects only the punishment for a violation of the false aircraft markings statute, the indictment returned in the Southern District of Florida in 1988 explicitly referred to the very crimes for which Adams and Runkel were indicted in the Northern District of Florida in 1991 in the present case.[3] Runkel pleaded guilty to the offense charged in the 1988 Southern District of Florida indictment, but Adams went to trial and was acquitted. After Runkel's guilty plea conviction and Adams' acquittal of the Southern District indictment charges relating to the airplane markings offense, both defendants were charged in the Northern District indictment in the present case with the controlled substances offenses.

The statutes averred as the punishment-enhancing controlled substance offenses in Adams' and Runkel's Southern District airplane markings indictment are the same statutory sections for which Adams and Runkel were subsequently indicted in Count 1, the conspiracy to import count, and Count 3, the

**2. Forgery of certificates, false marking of aircraft, and other aircraft registration violations**

(1) **Description of violations**

\* \* \*

**(H)** It shall be unlawful for any person—to knowingly and willfully display or cause to be displayed on any aircraft any marks which are false or misleading as to the nationality or registration of the aircraft.

49 U.S.C.App. § 1472(b)(1)(H).

\* \* \*

(2) **Penalties**

Any person who commits a violation of paragraph (1) shall be, upon conviction, subject to—

\* \* \*

**(B)** a fine of not more than $25,000 or imprisonment for a term of not more than 5 years, or both, if such violation was in connection with the act of transportation by aircraft of a controlled substance or of the aiding or facilitating of a controlled substance offense where such act is punishable by death or imprisonment for a term exceeding 1 year under a State or Federal law or is provided in connection with any act which is punishable by death or imprisonment for a term exceeding 1 year under a State or Federal law relating to a controlled substance (other than a law relating to simple possession of a controlled substance).

2. 49 U.S.C.App. § 1472(b)(2)(B).

3. A superseding indictment filed in the Southern District of Florida on September 13, 1988 charged that

OTTO J. RUNKEL
and
JAMES A. ADAMS,

did knowingly and willfully display and cause to be displayed on an aircraft, that is, a twin-engine Piper Navajo registered with the Federal Aviation Administration under number N333GT, marks that were false and misleading as to the nationality and registration of the aircraft, with the intent to commit crimes punishable by imprisonment for a term exceeding one year under federal laws relating to a controlled substance, that is, the importation of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 952(a), and Title 18, United States Code, Section 2, and conspiracy to import marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 963.

All in violation of Title 49, United States Code Appendix, Section 1472(b)(2)(A), and Title 18, United States Code, Section 2.

importation count, in the present Northern District case. The evidence presented to prove those two counts against Adams and proffered against Runkel in this Northern District case is virtually the same as that presented against Adams and proffered against Runkel in their Southern District prosecutions. It is unclear why the Government did not indict Adams and Runkel on the Count 1 and Count 3 charges in this case at the time it obtained the false aircraft markings indictment against them in the Southern District. Its failure to do so forms the basis of the double jeopardy contentions of Adams and Runkel about Counts 1 and 3 of the indictment in this case.[4]

■ Whether double jeopardy bars a subsequent prosecution is an issue for plenary review. *Mars v. Mounts,* 895 F.2d 1348, 1351 (11th Cir.1990). The Supreme Court has recently expressly overruled its decision in *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), and returned double jeopardy analysis to the traditional *Blockburger* test. *United States v. Dixon,* — U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). Because of *Dixon,* we will restrict our analysis to the *Blockburger* test and cases construing it. Under *Blockburger,* the double jeopardy inquiry turns on whether there are two offenses, or only one, and:

> [T]he test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.... "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."

*Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) (quoting *Morey v. Commonwealth,* 108 Mass. 433, 434 (1871)). *Blockburger* was a case of simultaneous multiple punishment, but "[t]he Double Jeopardy Clause 'protects against a

second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.'" *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977) (citation omitted). Thus, the Supreme Court has determined that the *Blockburger* test is to be applied to cases of consecutive prosecutions, *id.* 432 U.S. at 166, 97 S.Ct. at 2225–26, and it is the test we apply today.

The Government argues that the controlled substance counts only affect the punishment for the offense of carrying false or misleading markings on an aircraft. See footnote 2, above. It argues that, viewed in this light, the aircraft markings offense is an entirely separate offense requiring proof of elements not related to the subsequent drug prosecutions. From a review of the aircraft markings *statute* it appears the controlled substance counts are only factors to be taken into consideration at sentencing, not elements of the offense itself. From the *indictment* alone, however, it might appear that the controlled substance crimes are part of the aircraft markings offense and necessary elements to be proved. Thus, a comparison of the averments contained in the statutory offenses for each prosecution reveals that there is at least one element of each not required for proof of the other, because the statutory definition of the aircraft markings offense does not include the narcotics offenses. A comparison of the averments contained in the two indictments, on the other hand, suggests a double jeopardy violation, because the actual aircraft markings indictment appears to charge the controlled substance crimes as part of that offense. Thus, we are presented with the issue of whether the "elements" of an offense in a *Blockburger* analysis are to be drawn from the indictment or from the statute codifying the offense.

Other courts appear to be split on this issue. *Compare United States v. Benton,* 852 F.2d 1456, 1465 (6th Cir.1988) ("We fun-

---

**4.** Count 2, conspiracy to possess with intent to distribute, and Count 4, possession with intent to distribute, are different because that activity was not mentioned in the Southern District airplane markings indictment. Neither Adams nor Runkel contends that his conviction on those two counts is barred by double jeopardy principles.

damentally disagree that the Supreme Court has necessarily changed the focus of *Blockburger* analysis from the statutory elements of the offenses argued to be the 'same,' to the particular facts alleged in the indictment, or proffered as proof at trial. . . .") (footnote omitted), *cert. denied*, 488 U.S. 993, 109 S.Ct. 555, 102 L.Ed.2d 582 (1988) *with United States v. Sampol*, 636 F.2d 621, 652 (D.C.Cir. 1980) ("[T]he prohibition in the Constitution against placing an accused twice in jeopardy 'for the *same offense*' is directed at the actual '*offense*' with which he is charged and not only at the violated statutes."). The Supreme Court has not issued a definitive ruling on the issue. *Compare Whalen v. United States*, 445 U.S. 684, 711, 100 S.Ct. 1432, 1448, 63 L.Ed.2d 715 (1980) (Rehnquist, J., dissenting) (characterizing the majority's opinion as applying the *Blockburger* test to the indictment instead of the statute) *with id.* at 694 n. 8, 100 S.Ct. at 1439 n. 8 (refuting the dissent's characterization).

Our opinion in *Mars v. Mounts*, 895 F.2d 1348 (11th Cir.1990), although not dispositive of the question, provides considerable guidance. Mars had been prosecuted for first degree murder and acquitted. Based on questions posed to the judge by the jury, the acquittal was apparently due to a variance between the day the murder was alleged to have occurred and the day on which it was proved to have occurred. After his acquittal, Mars was reprosecuted and convicted under an indictment alleging the correct day of the murder. The State conceded that the second prosecution would have been impermissible as a double jeopardy violation except for the change in the day of the murder alleged in the second indictment. Relying on a "variance theory," the Florida state courts upheld the conviction, because Florida law permitted reprosecution under an indictment or bill of particulars charging different facts if the defendant had been acquitted solely because of a variance.

This Court held that the two successive prosecutions in *Mars* violated double jeopardy notwithstanding the different factual allegations about the date of the crime. The State argued that the two indictments satisfied the *Blockburger* test under the State's variance theory. We noted that "Florida's variance theory differs from the *Blockburger* test in that it focuses on the facts alleged in the indictments rather than the statutory elements of the crimes." *Id.* at 1355. We held that "under a strict application of the *Blockburger* test, which looks only to the statutory elements of the indictments, the prosecution of Mars for second-degree murder after his acquittal of first-degree murder violates double jeopardy." *Id.* at 1358. Therefore, this Court has said that in applying the *Blockburger* test a court must look to the statutory elements of an offense and not to indictment allegations that are not statutory elements of the offense.

The Supreme Court has also suggested that the focus of the inquiry in a *Blockburger* application is the statutory elements: "We recognized [in *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)] that the *Blockburger* test focuses on the proof necessary to prove the *statutory* elements of each offense, rather than on the actual evidence to be presented at trial." *Illinois v. Vitale*, 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228 (1980) (emphasis added). We are persuaded by the statements of then-Justice Rehnquist in his dissenting opinion in *Whalen v. United States:*

Because this Court has never been forced to apply *Blockburger* in the context of compound and predicate offenses, we have not had to decide whether *Blockburger* should be applied abstractly to the statutes in question or specifically to the indictment as framed in a particular case. Our past decisions seem to have assumed, however, that *Blockburger*'s analysis stands or falls on the wording of the statutes alone. Thus, in *Blockburger* itself the Court stated that "The applicable rule is that where the same act or transaction constitutes a violation of two distinct *statutory provisions*, the test to be applied to determine whether there are two offenses or only one, is whether each *provision* requires proof of a fact which the other does not." 284 U.S., at 304, 52 S.Ct., at 182 (emphasis added). More recently, we framed the test as whether " 'each *statute* requires proof of an additional fact which the other does not. . . .' " *Brown v. Ohio*,

[432 U.S. 161,] 166, 97 S.Ct. [2221], at 2226 [53 L.Ed.2d 187] quoting *Morey v. Commonwealth,* 108 Mass. 433, 434 (1871) (emphasis added). See also *Iannelli v. United States,* 420 U.S. [770], at 785 n. 17, 95 S.Ct. [1284], at 1294 n. 17 [43 L.Ed.2d 616 (1975) ] ("[T]he Court's application of the [*Blockburger*] test focuses on the statutory elements of the offense"); M. Friedland, Double Jeopardy 212–213 (1969) (noting the two possible interpretations and pointing out that "the word 'provision' is specifically used in the test" as stated in *Blockburger*).

*Whalen v. United States,* 445 U.S. 684, 710–11, 100 S.Ct. 1432, 1447–48, 63 L.Ed.2d 715 (1980) (Rehnquist, J., dissenting) (emphasis in original) (footnote omitted). Justice Rehnquist continued with this theme, stating:

> Indeed, the *Blockburger* test itself could be viewed as nothing but a rough proxy for [determining whether separate societal interests are protected by the different statutes], since, by asking whether two separate statutes each include an element the other does not, a court is really asking whether the legislature manifested an intention to serve two different interests in enacting the two statutes.

*Id.* at 713–14, 100 S.Ct. at 1449. The majority in *Whalen* did not disagree with the observations of Justice Rehnquist that we have quoted. Instead, the majority stated that it was not applying *Blockburger* to the facts alleged in the indictment as opposed to the statutory elements. *Id.* at 694 n. 8, 100 S.Ct. at 1439 n. 8. The dispute was over the result of the test in that case, not how to apply it.

◼ We hold that in consecutive prosecution double jeopardy analysis, the *Blockburger* test is to be applied to the statutory elements underlying each indictment, or count, not to the averments that go beyond the statutory elements. Looking only to the statutory elements, it is readily apparent that no double jeopardy violation exists in this case. A conviction for displaying false markings on an aircraft under 49 U.S.C.App. § 1472 has no statutory elements that overlap with any of the controlled substance crimes charged against Adams and Runkel in the indictment in this case.

## B. REFUSAL TO SUPPRESS ADAMS' STATEMENTS

Adams complains of the district court's refusal to suppress statements made by him to Customs agents after the Piper aircraft in which he and Runkel were travelling had returned to Florida and landed. Customs agents had been using a Blackhawk helicopter and another airplane to track Runkel and Adams as they were returning. After Runkel, the pilot, touched the plane down and stopped it, agents on the ground pulled a car in front of the airplane preventing it from rolling further. Adams was forced at gunpoint to lay down on the tarmac. He was searched and then made to sit on the tarmac near the airplane. One agent trained a shotgun on Adams and Runkel while the other searched the airplane. Agents spilled the contents of Adams' suitcase out in order to search it. They searched Adams' wallet and took possession of an airline ticket he was carrying. The agents did not return Adams' suitcase and ticket to him until they were ready to release him. When Adams asked to walk over and view the Blackhawk helicopter, an agent told him that he could not and that he must remain where he was. Adams was eventually put into the rear seat of an agent's car and the agents questioned him about the flight. Adams responded by saying that, because he was considering a purchase of the plane, he took advantage of an opportunity to go for a ride in it and had spent the day touring Florida in it. Runkel underwent similar interrogation. After finishing the questioning of Adams and Runkel, Customs agents seized the airplane and other evidence and allowed Adams and Runkel to walk away into the dark of night. It is conceded by the Government that *Miranda* warnings were not given at all during this encounter which lasted for between an hour and an hour and a half.

The court ruled that Adams' statement concerning the purpose of the flight was admissible, because Adams was not in custody when he made it. Adams claims that he was in custody and interrogated and that, therefore, the statement made by him without having been given *Miranda* warnings

was inadmissible. The Government responds that, as the district court found, Adams was not in custody when he was questioned, and, as such, *Miranda* warnings were ·not required.

■ *Miranda* "warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." *Endress v. Dugger*, 880 F.2d 1244, 1248 (11th Cir.1989), *cert. denied*, 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 287 (1990). "Since the warnings are required only in the situation of a custodial interrogation, many courts have addressed the issues of when a person is in 'custody' or has been 'interrogated' for the purposes of *Miranda*." *Id.* The district court's findings of fact regarding the motion to suppress are to be respected unless clearly erroneous, but the application of law to those facts is reviewed de novo. *Jacobs v. Singletary*, 952 F.2d 1282, 1291 (11th Cir.1992); *United States v. Nash*, 910 F.2d 749, 752 (11th Cir.1990). The district court found that Adams was not in custody when he made the statement in response to questioning by the agents, and that *Miranda* warnings were, therefore, not required.

■ We start our analysis by noting that Adams was clearly subjected to interrogation. He was expressly questioned about the flight; he was interrogated. Next, we turn to whether Adams was in custody when the statement in question was elicited from him. "[I]n order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the · suspect's position would feel a restraint on his freedom of movement fairly characterized [so that] he would not feel free to leave." *Jacobs v. Singletary*, 952 F.2d at 1291 (quoting *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir.1987)). After a review of the transcript of the suppression hearing conducted in the district court, we conclude that a reasonable man in Adams' position would not have felt free to leave or move at the time the statement in question was elicited. Before Adams made the statement, Customs agents had prevented the plane from moving by parking a car in front of it, forced Adams to lie on his stomach at gunpoint, kept a shotgun trained on him while searching the plane, and took possession of Adams' suitcase and plane ticket. At no time during the encounter did the agents say or even suggest that Adams was free to leave. Therefore, Adams was in custody; custodial interrogation without *Miranda* warnings occurred, and it produced a statement used against Adams at trial.

The Government argues that even if there was custodial interrogation, no *Miranda* warnings were required because this was a border stop. It relies on language from this Court's opinion in *United States v. Lueck*, 678 F.2d 895 (11th Cir.1982):

> Interrogation at the border constitutes one notable exception to the constitutional protection of *Miranda*. Because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States. Hence, individuals arriving in this country are not entitled to *Miranda* warnings.

*Id.* at 899. It is not altogether clear, however, that *Lueck* will bear the weight the Government would place upon it. After the statements quoted, the opinion proceeds to an evaluation of whether the border interrogation in that case occurred while the interrogatee was in custody. *Id.* at 900–01. The *Lueck* Court eventually concluded that because no custodial interrogation had occurred, "the appellant was subjected to no more than a proper border inquiry, meriting no entitlement to *Miranda* warnings." *Id.* at 902. This reasoning is somewhat problematical, because *Miranda* warnings are not required absent custodial interrogation, at the border or elsewhere. If a border exception to *Miranda* requires the absence of custodial interrogation, it is no exception at all. We need not delve deeper into this apparent anomaly, because any error in the admission of the statement was harmless error.

■ The Government did not argue harmless error in its brief on appeal, but this Court may consider the harmlessness of a trial court's error where it has not been briefed by the Government. *See United*

*States v. Ellis,* 971 F.2d 701, 706 (11th Cir. 1992). Other circuits have also held that harmless error can be addressed *sua sponte* in cases where the harmlessness is obvious. *See Lufkins v. Leapley,* 965 F.2d 1477, 1481 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 271, 121 L.Ed.2d 200 (1992); *United States v. Pryce,* 938 F.2d 1343, 1347–52 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1488, 117 L.Ed.2d 629, *and cert. denied,* —— U.S. ——, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992); *United States v. Rodriguez Cortes,* 949 F.2d 532, 542–43 (1st Cir. 1991); *United States v. Giovannetti,* 928 F.2d 225, 226–27 (7th Cir.1991). Here, it is patently obvious.

"The failure to suppress statements obtained in violation of *Miranda* can be harmless error." *Owen v. Alabama,* 849 F.2d 536, 540 (11th Cir.1988); *see also Parker v. Singletary,* 974 F.2d 1562, 1574 (11th Cir.1992). "To qualify as harmless, an error must not contribute to the defendant's conviction." *Owen,* 849 F.2d at 540. "If, upon its reading of the trial record, the appellate court is firmly convinced that the evidence of guilt was so overwhelming that the trier of fact would have reached the same result without the tainted evidence, then there is insufficient prejudice to mandate the invalidation of the conviction." *Cape v. Francis,* 741 F.2d 1287, 1294–95 (11th Cir.1984), *cert. denied,* 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 245 (1985); *see also Owen,* 849 F.2d at 540. After a thorough review of the record we conclude that the district court's failure to exclude Adams' statement from evidence was harmless error.

In this case the Government offered overwhelming evidence of Adams' guilt. A witness for the Government, David Poole, testified that he was acquainted with Runkel and with the airplane Runkel and Adams had been flying. He testified that Runkel approached him to install an illegal fuel bladder in the aircraft to increase its fuel storage capacity so that it would be capable of reaching Belize and returning without refueling. Runkel told him that the trip was to pick up drugs. Poole testified that he had met Runkel's "friend" who would be accompanying Runkel on the smuggling trip. That friend was originally introduced to Poole as "Jay," but Poole identified Adams in court when asked if Jay was present. Many conspirators used aliases to minimize the knowledge of the other participants. Poole, Runkel and Adams had discussed the amount of fuel needed and tested the plane's new fuel storage system. Poole testified that Adams was present during the preparations for the trip spanning several hours over two evenings. Poole was present when the bladder was filled with fuel and Runkel and Adams took off.

Poole had also acted as an informant, and based on an affidavit from him, Customs had obtained a court order to place a transponder on the airplane before Runkel and Adams took off. A Customs agent testified that the airplane was tracked taking off from an airport in Florida at approximately 7:30 in the morning and returning to U.S. airspace at approximately 5:00 in the evening. The airplane was intercepted by Customs agents when it landed at the airport from which it had left. The plane was searched and it yielded incriminating evidence.

The Government offered photographs of the interior of the plane which showed how seats had been removed to make room for the fuel bladder and cargo. A Customs agent identified navigation charts found in the airplane depicting Belize in both general and local detail, and a chart depicting the southern portion of the United States. The agents found a two-way radio for air-to-ground communication. Also contained in the aircraft were disposable gloves. A Customs agent, as well as one of the conspirators, testified that gloves were used by smugglers to avoid leaving fingerprints. The agent testified that he found in the airplane visqueen plastic sheeting that had been balled up. Plastic sheeting is used by smugglers to line the interior of an airplane to prevent marijuana residue from being left behind. Also found in the plane was an electronic "bug" detector "used to perhaps find out if someone is wearing a body wire."

Runkel's address book was found in the aircraft, and it contained the telephone number of Johnny Crawford, the conspiracy's source for marijuana in Belize. Also found in the aircraft was a hand-held portable vacuum, commercial grade air freshener (marijuana has a distinctive odor), and a *High Times* magazine. Each of these items was received into evidence.

Glen Munro testified that Runkel told him he was planning to bring a friend from Wisconsin on the trip to Belize; Adams was from Wisconsin. Munro also testified that the "bug" detector found in the airplane was the kind he used to detect electronic surveillance devices. Additionally, there was much testimony from the other conspirators regarding the nature of Adams' and Runkel's flight and how the other conspirators reacted when it did not show up as planned at the airstrip where they were waiting to unload it.

In contrast to the extent of the other evidence offered against him, the Government only once alluded to the statement taken from Adams, and the Government did not invite the Customs agent to speculate on its relevance. The statement itself was not directly incriminating. We are convinced beyond a reasonable doubt that admission of the statement did not contribute to Adams' conviction, because even without consideration of it there was overwhelming evidence of Adams' guilt. We therefore hold that any error in admission of the statement was harmless error.

### C. WARRANTLESS SEARCH OF AIRPLANE

■ Adams next complains that the evidence discovered in the Piper aircraft after it landed with he and Runkel aboard should have been suppressed because it was the product of an illegal warrantless search. The Government's position is that no warrant is necessary for the border search of an aircraft. The district court's findings of fact about this issue are not to be overturned unless clearly erroneous, but the application of law to those facts is reviewed de novo.

*United States v. Nash,* 910 F.2d 749, 752 (11th Cir.1990).

■ It is clear that the search was a valid border search, one for which a warrant was not required. "The fact that one is in the process of crossing an international boundary provides sufficient reason in itself to permit a search for aliens or contraband, without the presence of any other circumstance that would normally have to attend the requirements of the Fourth Amendment." *United States v. Moreno,* 778 F.2d 719, 721 (11th Cir.1985) (quoting *United States v. McDaniel,* 463 F.2d 129, 132 (5th Cir.1972)). "Such a search is reasonable for Fourth Amendment purposes simply because a border has been crossed. The mere fact that in this case the search did not technically occur at the border is irrelevant; the point where [the defendant] ultimately landed his aircraft is construed as the functional equivalent of the border." *United States v. Hewitt,* 724 F.2d 117, 119 (11th Cir.1984); *see also United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977).

■ We reject Adams' argument that the search could not have been a border search because he was in a U.S. registered airplane having taken off from an airstrip in the United States and never having landed in a foreign country. In *United States v. Haley,* 743 F.2d 862, 865 (11th Cir.1984), we held that there is no requirement that the Government prove that a flight originated in a foreign land for a border search to be valid. Customs agents tracked the Adams and Runkel plane well out of American airspace and tracked it coming back into American airspace. In *United States v. Stone,* 659 F.2d 569, 573 (5th Cir. Unit B Oct. 1981), we held that the mere sighting of an airplane passing into United States airspace satisfied the requirements of a border crossing for search and seizure purposes. *Id. See also United States v. Garcia,* 672 F.2d 1349, 1357 (11th Cir.1982). Where an aircraft has crossed a United States border, the Government need not prove at trial that the flight originated in a foreign land, and, indeed, a flight need not in fact have originated in a foreign land, for a border search of the aircraft to be upheld. All that is required is that "the information,

including the fact of the actual border crossing, possessed by the Customs agents prior to the search of [the defendant's] airplane was sufficient to reasonably support an inference that there was a substantial likelihood that the airplane had come from a foreign location." *Haley*, 743 F.2d at 866.

The Customs agents in this case were following up on information from a reliable informant; they had tracked the plane in the direction of Belize, a country the informant said was the destination and one known for being a source of narcotics. Adams and Runkel had been gone between nine and ten hours before the agents observed them returning to United States airspace. This interval of time is sufficient for the plane to have reached a foreign country, landed, loaded whatever it was seeking, and taken off again. The information possessed by the Customs agents amply supported an inference that the plane had come from a foreign land. Therefore, the search of the Piper aircraft involved in this case was a valid border search and no warrant was required.

## D. DENIAL OF SEVERANCE FOR ADAMS AND COHRON

■ Defendants Adams and Cohron made pre-trial motions to sever their cases from the others. The district court denied both motions and now the defendants each claim that that denial constitutes reversible error. We may reverse a district court's denial of a severance motion only if we find that the court abused its discretion. *United States v. Hernandez*, 921 F.2d 1569, 1578 (11th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 2271, 114 L.Ed.2d 722 (1991). We will treat each defendant's argument separately.

### 1. ADAMS

■ Adams argues that the district court's refusal to sever his trial from that of his co-defendants was error because he was not implicated in the majority of evidence presented against his co-defendants. The Government offered evidence of numerous drug transactions and extensive smuggling activities. The only evidence concerning Adams was in regard to the one unsuccessful trip to Belize we have discussed. Adams

claims that this disparity in evidence was prejudicial.

Joinder of defendants is proper "if they are alleged to have participated in the same . . . series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). "If the jury cannot keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to each, severance should be granted." *United States v. Carrazana*, 921 F.2d 1557, 1567 (11th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 191, 116 L.Ed.2d 152, *and cert. denied*, — U.S. —, 112 S.Ct. 269, 116 L.Ed.2d 221 (1991). We have held:

> In conspiracy cases like this one, the general principle is well-settled that "persons who are charged together should also be tried together." In evaluating a motion for severance, this court must determine whether the prejudice inherent in a joint trial outweighs the interests in judicial economy. To establish that the district court's balancing of interests was an abuse of discretion, [the defendant] must "demonstrate that a joint trial resulted in specific and compelling prejudice to the conduct of his defense." "Compelling prejudice" is demonstrated by a showing that the jury was unable to make an individualized determination as to each defendant.

*United States v. Saget*, 991 F.2d 702, 707 (11th Cir.1993) (citations omitted). "This is a heavy burden, and one which mere conclusory allegations cannot carry." *United States v. Hogan*, 986 F.2d 1364, 1375 (11th Cir. 1993). "[C]autionary instructions to the jury to consider the evidence as to each defendant separately are presumed to guard adequately against prejudice." *United States v. Gonzalez*, 940 F.2d 1413, 1428 (11th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 910, 116 L.Ed.2d 810 (1992), *cert. denied*, — U.S. —, 112 S.Ct. 1194, 117 L.Ed.2d 435 (1992), . *and cert. denied*, — U.S. —, 112 S.Ct. 1194, 117 L.Ed.2d 435 (1992).

Adams has not demonstrated any instances of specific and compelling prejudice. The burden was on him to show that the jury could not keep separate the facts relating to him. Adams' co-conspirators were waiting

on the ground for the return of his flight, and the evidence of Adams' aborted smuggling flight was intertwined with the criminal actions of his co-defendants. The district court was careful to give cautionary instructions concerning multiple conspiracies, and instructed the jury that it should consider the case of each defendant separately and individually and could acquit some defendants and convict others. We conclude that the district court did not abuse its discretion in denying Adams' severance motion.

## 2. COHRON

■ Cohron presents a different severance argument. He argues that the refusal to sever his trial was error because specific and compelling prejudice flowed from his inability to obtain testimony from his co-defendant Jones, who was the only source of rebuttal for some of the testimony against Cohron. Some of the conspirators testified at trial that Cohron aided in the construction of an airstrip on the property of Jones. Cohron moved for a severance before and after trial, and after trial offered an affidavit from Jones averring that the airstrip was in existence prior to the time at which the others had testified it was constructed, and averring that Cohron had nothing to do with its construction. Had his case been severed, Cohron supposedly could have subpoenaed Jones' testimony; his inability to do that allegedly resulted in an unfair and prejudicial trial. We have held that:

> To obtain a severance on the ground that a codefendant will testify favorably, a defendant must show: "(1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed have testified at a separate trial." Points one and three are interrelated in that there can be no bona fide need for testimony which is not materially helpful to the defendant's theory of defense. If the defendant satisfies those four threshold requirements, then the trial court must: "(1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice

caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion."

*United States v. Funt,* 896 F.2d 1288, 1297 (11th Cir.1990) (citations omitted); *accord, United States v. Cross,* 928 F.2d 1030, 1037 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 594, 116 L.Ed.2d 618 (1991), *and cert. denied,* —— U.S. ——, 112 S.Ct. 941, 117 L.Ed.2d 112 (1992); *United States v. Machado,* 804 F.2d 1537, 1544 (11th Cir.1986).

We need not inquire into the first three threshold requirements, because Cohron clearly did not meet the fourth one. He did not establish that Jones would have testified at Cohron's separate trial had the case been severed. Jones did not testify at the joint trial, electing instead to exercise his Fifth Amendment privilege against self-incrimination. There is nothing to indicate that after he was convicted Jones would have foregone his privilege not to testify in a separate trial for Cohron. *See United States v. Mathews,* 997 F.2d 848, 850–51 n. 4 (11th Cir.1993) ("A defendant who has been convicted does not necessarily lose the Fifth Amendment right against self-incrimination as it concerns facts and circumstances surrounding the crime."). The affidavit from Jones which Cohron proffered does not state that Jones would have testified for Cohron in a separate trial.

Even if Cohron had satisfied that and the other three threshold requirements, he would still lose under the second set of inquiries. The significance of the possible testimony to his defense and the extent of prejudice flowing from his inability to present that testimony are lessened by the multitude and magnitude of evidence used to convict Cohron. Moreover, the cost in judicial resources of a retrial in such a complex conspiracy case as this would be great. *See Cross,* 928 F.2d at 1038. The district court did not abuse its discretion in denying Cohron's severance motion.

## E. DRUG QUANTITIES FOR SENTENCING

■ Adams and Davis claim that the district court erroneously determined their

base offense level for sentencing under the Sentencing Guidelines by counting against them excessive quantities of marijuana. The Sentencing Guidelines in effect at the time of the sentencing of these defendants describe the conduct on which a base offense level is determined, as "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable...." U.S.S.G. § 1B1.3(a)(1) (Nov. 1990). The commentary to that section explains that:

> In the case of criminal activity undertaken in concert with others, ... the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant. Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly-undertaken criminal activity, and hence the relevant conduct, is not necessarily the same for every participant.

U.S.S.G. § 1B1.3, comment. (n. 1) (Nov. 1990). Conspirators are responsible for sentencing purposes for the reasonably foreseeable acts of co-conspirators taken in furtherance of the conspiracy, "but not acts in the conspiracy that were not within the scope of the defendant's agreement." *United States v. Andrews*, 953 F.2d 1312, 1319 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 3007, 120 L.Ed.2d 882, *cert. denied*, —— U.S. ——, 112 S.Ct. 3008, 120 L.Ed.2d 882, *and cert. denied*, —— U.S. ——, 112 S.Ct. 3048, 120 L.Ed.2d 915 (1992). A trial court's determination of the quantity of drugs for sentencing purposes is a question of fact subject to clearly erroneous review. *United States v. Robinson*, 935 F.2d 201, 205 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 789 (1992). "[D]istrict courts are required to make factual determinations at sentencing only by a preponderance of the evidence." *United States v. Louis*, 967 F.2d 1550, 1553 (11th Cir.1992); *Andrews*, 953 F.2d at 1319. We will review the contentions of the defendants with these principles in mind.

### 1. DAVIS

 Davis argues that the greatest quantity of marijuana he could be charged with is about 2000 kilograms, for a base offense level of 32. The district court held Davis responsible for an amount of marijuana greater than 3000 kilograms, which resulted in a base offense level of 34. Evidence at trial showed Davis was deeply implicated in the overall scheme. Therefore, it was not clearly erroneous for the sentencing court to find that he could have reasonably foreseen a much greater amount of marijuana being imported and distributed than the already large amount to which he was directly connected.

### 2. ADAMS

The issue involving Adams presents a closer question. The district court determined that statutory mandatory minimum sentencing applied to Counts 3 and 4, and the court utilized the Sentencing Guidelines only for Counts 1 and 2, the conspiracy counts. Adams' argument concerns only the district court's application of the Guidelines, and so is applicable only to Counts 1 and 2.

Adams conceded that the 1200 pounds, or approximately 550 kilograms, of marijuana that would have been transported if the flight to Belize had gone as planned was attributable to him. That would have given him a base offense level of 28. The district court held that the facts would not justify attributing to Adams the amount of marijuana involved in the entire conspiracy. In rejecting a presentence investigation (PSI) recommendation that Adams be held responsible for the entire conspiratorial amount, the court stated:

> Well, I'm troubled by that as well because there's no evidence that Mr. Adams ever touched a single bit of marijuana for which he's being held accountable. The only evidence is that he flew on a plane that intended to pick up twelve hundred pounds and did not pick up any and that was the extent of his participation.
>
> . . . .
>
> I've held in other cases it was reasonably foreseeable in this type of operation that more than one flight would be involved.

Now, the question of how many flights really depends upon the individual and how that individual was recruited and what they did and how much knowledge they could reasonably be held accountable for under those circumstances. . . .

R18–8, 9, 10. The court's account of the evidence and its reasoning in rejecting the PSI recommendation were correct. Its rationale about when to hold a defendant liable for additional flights is also appropriate.

The problem in this case, however, is that in addition to counting against Adams the 1200 pounds of marijuana he had planned to import on the flight he took, the district court also attributed to Adams a hypothetical second load that Adams never attempted to transport. The court said:

> And giving, you know, giving the assumption that more than one flight would have been involved, if you double that you're still no more than level thirty, I'm sure, and level thirty takes you to a thousand kilograms, which would be twenty-two hundred pounds plus. I'll give him the benefit of the doubt and establish that it was only foreseeable that he would have been involved with less than a thousand kilograms, which is a level thirty. I think that's entirely consistent with the evidence.

R18–11. There was no evidence that Adams intended to be involved with another flight or that it was foreseeable to him that there would be another flight. The evidence concerning Adams connected him only with the one aborted smuggling trip, a trip in which the plans were to transport 1200 pounds of marijuana. A sentencing court may not speculate on the extent of a defendant's involvement in a conspiracy; instead, such a finding must be supported by a preponderance of the evidence, just as any other fact-finding during sentencing. Because there was no evidence that Adams had any connection with any of the conspirators other than Runkel and no evidence that Adams was aware of or agreed to participate in a conspiracy involving more than one smuggling trip, the district court's finding that another flight was reasonably foreseeable to Adams is clearly erroneous. Although it is possible that Adams might have participated in another flight, such a prediction must be supported by a preponderance of the evidence before it can be used to increase a sentence.

## F. SUFFICIENCY OF THE EVIDENCE TO CONVICT COHRON

Cohron argues that the evidence presented at trial is insufficient to support his conviction on any of the four counts. His arguments rely on the five year statute of limitations period for these offenses, 18 U.S.C. § 3282. Cohron argues that evidence of actions occurring more than five years prior to the indictment should not have been considered by the jury because prosecution for those actions is barred by the statute of limitations. Cohron contends that once evidence of transactions occurring outside the five-year limitations period is excluded, there was insufficient evidence to prove that he imported as much marijuana as the indictment charged. The indictment charged he imported 1000 kilograms or more of marijuana. Cohron concedes for purposes of this argument that the evidence of transactions within the limitations period inculpated him in two transactions, but he claims the evidence indisputably proves that less than 1000 kilograms of marijuana could have been imported in those two transactions that were within the limitations period. Therefore, contends Cohron, the Government failed to prove by evidence of transactions within the limitations period an averment of each count of the indictment—that the quantity of marijuana involved was 1000 kilograms or more. We will first address his argument as it applies to the two conspiracy counts and then as it relates to the two substantive counts.

### 1. Conspiracy Convictions

Cohron's argument as it relates to his convictions on the two conspiracy counts is meritless, because the statute of limitations does not begin to run on a conspiracy until that conspiracy has ended. *United States v. Benson,* 846 F.2d 1338, 1340 (11th Cir.1988); *United States v. Finestone,* 816 F.2d 583, 589 (11th Cir.), *cert. denied,* 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987); *United States v. LeQuire,* 943 F.2d

1554, 1565 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). A conspiracy is considered a discrete crime for statute of limitations purposes. For a conspiracy prosecution to be barred by the statute of limitations, the time between the conspiracy's end, or the defendant's affirmative withdrawal, and the indictment must be longer than the statutory limitations period. If this is not the case, the conspiracy prosecution may proceed, and evidence of any acts in furtherance of the conspiracy are admissible even if they occurred longer than the statutory period before the indictment. *United States v. Gonzalez,* 921 F.2d 1530, 1548 (11th Cir.) (predicate acts for RICO conspiracy occurring outside limitations period could support conviction if conspiracy continued into limitations period), *cert. denied,* —— U.S. ——, 112 S.Ct. 96, 116 L.Ed.2d 68, *and cert. denied,* —— U.S. ——, 112 S.Ct. 178, 116 L.Ed.2d 140 (1991); *United States v. Butler,* 792 F.2d 1528, 1532 (11th Cir.) (same for 18 U.S.C. § 1382 statute of limitations), *cert. denied,* 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986). Cohron does not claim that the conspiracy ceased operations outside the statutory period, nor does he claim to have withdrawn outside that period. Therefore, all acts committed in furtherance of the conspiracy during the entire life of the conspiracy were properly admitted against him at trial. The evidence was sufficient to support Cohron's conspiracy convictions.

### 2. Substantive Offense Convictions

To attack his substantive convictions Cohron relies on the interplay between the statute of limitations and the court's *Pinkerton* instruction to the jury. His argument is that the jury's general guilty verdict that he was involved with 1000 kilograms or more of marijuana must be grounded on one of two bases: the jury may have impermissibly considered Cohron's actions before the statutory period, *or* it may have permissibly relied on the actions of Cohron's co-conspirators for which he is liable under *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Cohron contends that because it cannot be established whether the jury's verdict was actually based on a permissible

basis, or on an impermissible one, we must set it aside. *See Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); *but see Griffin v. United States,* —— U.S. ——, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (criticizing *Yates*).

■ Cohron's argument fails because an essential premise of it is that the Government had to prove at trial that the quantity of marijuana he was involved in was 1000 or more kilograms. Case law in this Circuit establishes that the quantity of drugs is not an element of controlled substance offenses. *United States v. Cross,* 916 F.2d 622, 623 (11th Cir.1990) (A controlled substance violation may occur "without regard to the nature and quantity of the controlled substance."), *cert. denied,* 499 U.S. 929, 111 S.Ct. 1331, 113 L.Ed.2d 263 (1991); *United States v. Perez,* 960 F.2d 1569, 1574–75 (11th Cir.1992), ("only definitional elements of the offense [need] appear in the indictment," and not quantity), *cert. denied,* —— U.S. ——, 113 S.Ct. 1421, 122 L.Ed.2d 790 (1993). It is nonetheless true that the indictment did allege 1000 kilograms of marijuana or more. So, the question is whether failure to prove a quantity of controlled substances alleged in the indictment, which is not an element of the offense, is a material variance requiring reversal. Our cases say no. *United States v. Hanson,* 835 F.2d 815, 817 (11th Cir.1988) (no reversal where 1000 grams cocaine alleged and 861 grams claimed to have been proved); *United States v. Ard,* 731 F.2d 718, 725 (11th Cir. 1984) (no reversal where 1000 pounds marijuana alleged in indictment and single sale of less than that quantity claimed to have been proved); *United States v. Sheikh,* 654 F.2d 1057, 1066–67 (5th Cir. Unit A Sep. 1981) (no reversal where 4.4 pounds heroin alleged in indictment and 14 grams claimed to have been proved), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); *United States v. Juarez,* 573 F.2d 267, 278 (5th Cir.) (no reversal where 5 ounces heroin alleged in indictment and 23.63 grams claimed to have been proved), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978). Even if the evidence of transactions occurring within the statute of limitations period proved less than the 1000 kilograms alleged in the indictment,

the Government was not required to prove that amount. Therefore, Cohron is not entitled to a reversal of his conviction on the substantive counts, just as he is not entitled to a reversal on the conspiracy counts, either.[5]

## G. MANDATORY MINIMUM SENTENCING

■ Cohron received mandatory minimum sentences for his conviction on Count 3, importing 1000 or more kilograms of marijuana, and on Count 4, possessing with intent to distribute 1000 or more kilograms of marijuana.[6]

Cohron contends that application of the mandatory minimum sentence provisions to him violated ex post facto principles. The mandatory minimum sentence provisions were enacted on October 27, 1986.[7] Cohron argues that evidence of acts occurring before that date was considered by the district court in its finding that Cohron was involved with 1000 kilograms or more of marijuana.

The district court was aware that its consideration of Cohron's substantive importation and possession acts occurring before the enactment of the mandatory minimum provisions might result in an ex post facto violation. The court nonetheless applied the mandatory minimum provisions, because it reasoned that the evidence established that even after the enactment of those provisions

Cohron was involved with 1000 or more kilograms of marijuana. Unlike the problem with ascertaining the basis of a jury's general verdict, here we have a district court explaining the basis for the result it reached. We need not be concerned, therefore, with whether evidence of actions occurring before enactment of the mandatory minimum provisions might have been considered by the court; we know it was not. All that is left for us to determine is whether the district court's conclusion is clearly erroneous.

■ A sentencing court's factual determinations must be supported by a preponderance of the evidence. *United States v. Louis,* 967 F.2d 1550, 1553 (11th Cir.1992); *United States v. Andrews,* 953 F.2d 1312, 1319 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 3007, 120 L.Ed.2d 882, *cert. denied,* — U.S. —, 112 S.Ct. 3008, 120 L.Ed.2d 882 *and cert. denied,* — U.S. —, 112 S.Ct. 3048, 120 L.Ed.2d 915 (1992). Evidence considered by the court need not be in admissible form. *United States v. Gonzalez,* 661 F.2d 488, 495 (5th Cir. Unit B Nov. 1981); *see also United States v. Lynch,* 934 F.2d 1226, 1234–35 (11th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992); *United States v. Ignancio Munio,* 909 F.2d 436, 438–39 & n. 3 (11th Cir.1990), *cert. denied,* 499 U.S. 938, 111 S.Ct. 1393, 113 L.Ed.2d 449 (1991). There was evidence at trial of transactions occurring after October 27, 1986 which involved

---

**5.** The foregoing reasoning applies equally to Cohron's convictions on the conspiracy counts, and is an alternative ground for rejecting Cohron's sufficiency of the evidence argument as to them.

**6.** The mandatory minimum sentence provisions were not applied to Cohron's convictions under Counts 1 and 2. Instead, the Sentencing Guidelines, which took effect in November of 1987, were applied to those counts.

The sentences imposed under the Guidelines were proper because a statutory change which takes effect during an ongoing conspiracy subjects conspiratorial acts occurring before the statutory change to the new provision. *United States v. Nixon,* 918 F.2d 895, 906 (11th Cir. 1990); *United States v. Pippin,* 903 F.2d 1478, 1482 (11th Cir.1990); *United States v. Wells Fargo Armored Service Corp.,* 587 F.2d 782, 782 (5th Cir.1979). Because the conspiracy did not cease

to operate, and Cohron did not withdraw, before the new sentencing provisions became effective, all of Cohron's conspiratorial acts were properly considered in sentencing him under the Sentencing Guidelines.

**7.** The Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207 (1986), took effect on October 27, 1986. The law amended 21 U.S.C. § 841 to require minimum 10 year sentences for offenders convicted of possessing 1000 kilograms or more of marijuana. Pub.L. No. 99–570, § 1002, 100 Stat. 3207–2 (1986) (codified as amended at 21 U.S.C. § 841(b)(1)(A)(vii)). The same bill also amended 21 U.S.C. § 960 to require minimum 10 year sentences for offenders convicted of importing into this country 1000 kilograms or more of marijuana. Pub.L. No. 99–570, § 1302, 100 Stat. 3702–15 (1986) (codified as amended at 21 U.S.C. § 960(b)(1)(G)).

more than 1000 kilograms of marijuana.[8] Cohron claims that the evidence did not implicate him in enough of those transactions to hold him responsible for 1000 kilograms. The district court could properly consider the actions of Cohron's co-conspirators in arriving at an amount for which Cohron was responsible. We, therefore, hold that the district court's conclusion that Cohron was involved with 1000 kilograms of marijuana in transactions occurring after October 27, 1986 is not clearly erroneous. Cohron's claim that it was error to apply the mandatory minimum provisions to his convictions on the substantive counts is without merit.

## H. WITNESSES IN PRISON CLOTHES

■ Defendants Jones and Davis claim that they suffered reversible prejudice because some of their co-conspirators appearing in court as witnesses against them wore prison uniforms and the Government prosecutors commented on that attire. The Government called five co-conspirators as witnesses and noted to each one that he wore prison clothing and then asked if he was incarcerated. That was all the prosecutors said about the clothing of the witnesses. *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), forbids a defendant from being forced, over his objection, to wear prison garb at his trial, but these defendants were not. This Court's predecessor, considering a habeas petition, held that no prejudice flowed from an accused's co-defendant being brought into the courtroom for identification wearing a prison uniform. *Cook v. Beto*, 425 F.2d 1066, 1067 (5th Cir.), *cert. denied*, 400 U.S. 944, 91 S.Ct. 248, 27 L.Ed.2d 249 (1970); *see also Johnson v. Spalding*, 510 F.Supp. 164 (E.D.Wash.1981) (in habeas petition, no prejudice flowed from witnesses testifying in prison clothing), *aff'd*, 669 F.2d 589 (9th Cir.), *cert. denied*, 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982). The inference to be drawn from prison clothing is that the witnesses were in prison, a fact that is not inadmissible. No error was committed.

## I. MULTIPLE CONSPIRACIES

■ Jones and Davis argue a material variance in that they were indicted for a single conspiracy and contend that the evidence showed multiple conspiracies. They argue that this variance from the indictment is fatal to their convictions. The question of whether the evidence establishes a single conspiracy is a factfinding for the jury and, even if multiple conspiracies arguably exist, there will be no variance if, viewing the evidence in the light most favorable to the Government, a reasonable trier of fact could have found beyond a reasonable doubt the existence of a single conspiracy. *United States v. Reed*, 980 F.2d 1568, 1581 (11th Cir.), *cert. denied*, ── U.S. ──, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993); *United States v. Prince*, 883 F.2d 953, 959 (11th Cir.1989). We consider the following factors in assessing whether the jury could have found a single conspiracy: "(1) whether a common goal existed, (2) the nature of the scheme underlying the crimes charged, and (3) the overlap of participants." *Reed*, 980 F.2d at 1582; *accord Prince*, 883 F.2d at 959.

■ The jury in this case was properly instructed on the possibility of multiple conspiracies, and there was sufficient evidence to prove a single conspiracy. There was clearly a common goal, the importation of marijuana from Belize. The nature of the criminal scheme stayed remarkably constant throughout the progress of the conspiracy. Because the scheme involved a large operation, there were quite a few participants, but there was also substantial overlap among them. Some participants were involved in all of the transactions. Thus, consideration of the three factors demonstrates that the appellants were properly convicted of a single conspiracy.

## IV. CONCLUSION

We conclude that the convictions of all of the defendants are due to be AFFIRMED.

---

**8.** Brief of Davis and Jones at 16 (Liberty County load occurring sometime after April 1987), *id.* at 18 (Compass Lake load), *id.* at 19 & 21 (Santa Rosa County loads), *id.* at 20 (Hunting Club load), *id.* at 20 (Belize Crash), *id.* at 24 (Mexico Crash), and *id.* at 25 (Pipeline load).

The sentences given to each defendant are also AFFIRMED, with the exception of Adams' sentences on Counts 1 and 2. The sentences for Adams on those counts are VACATED and his case is REMANDED to the district court so that it may resentence Adams in accordance with this opinion.